IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

LEE PELE,                          )
                                   )
      Plaintiff,                   )
                                   )
          v.                       )    1:13cv1531 (JCC/TRJ)
                                   )
PENNSYLVANIA HIGHER EDUCATION      )
ASSISTANCE AGENCY d/b/a            )
American Education services,       )
                                   )
                                   )
      Defendant.                   )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant
Pennsylvania Higher Education Assistance Agency's ("Defendant"
or "PHEAA") Motion to Dismiss based on Eleventh Amendment.
[Dkt. 12.]  For the following reasons the Court will deny
Defendant's Motion to Dismiss.

### I.    Background

This case arises out of alleged violations of the Fair
Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*

### A.   Factual Background

Plaintiff Lee Pele ("Plaintiff" or "Pele") is a
resident and citizen of the Commonwealth of Virginia.  (Am.
Compl. ¶ 2.)  Defendant PHEAA is a student loan servicing

1

company that furnishes information to consumer reporting agencies as contemplated by the FCRA, 15 U.S.C. § 1681-s-2(a-b). (Am. Compl. ¶¶ 1, 3.)

Pele alleges that he received federal student loans issued under the Federal Family Education Loan Program ("FFELP"), 20 U.S.C. §§ 1071-1087.4. (Am. Compl. ¶¶ 1, 5, 6.) Pele is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. § 1681a(b) and (c). (Am. Compl. ¶ 2.) Pele alleges that PHEAA acted as the loan servicer for his student loans.

Pele alleges that PHEAA placed on his credit file defaulted student loans that "he never authorized, initiated, received the proceeds or guaranteed." (Am. Compl. ¶¶ 5, 6.) In February 2013, Pele began receiving collection calls from a debt collector called Windham Professionals ("Windham") seeking to collect over $137,000.00 in defaulted student loans. (Am. Compl. ¶ 7.) According to Windham's collector, Pele had been a co-signer on the loans at issue. (Am. Compl. ¶ 8.) Pele did not initiate, guaranty or receive any benefit from these loans. (Am. Compl. ¶ 7.)

On March 19, 2013, Pele sent credit dispute letters to the credit reporting agencies TransUnion, Equifax and Experian. (Am. Compl. ¶ 14.) As a result of these letters, four Automated Credit Dispute Verifications ("ACDV") were sent to PHEAA by the credit reporting agencies. (Am. Compl. ¶ 21.) On April 5,

2012, PHEAA responded to all four ACDVs "by modifying, but not deleting, the information" from Plaintiff's credit file. (Am. Compl. ¶ 24.) Plaintiff alleges that PHEAA "continued to attribute the debts to Mr. Pele to the credit reporting agencies." (*Id.*)

Plaintiff alleges that Defendant has both negligently and willfully violated the FCRA in its response to the ACDVs. (Am. Compl. ¶ 25.) First, Plaintiff alleges that PHEAA has no procedure in place to investigate a consumer's claim of identity theft. (*Id.*) Second, Plaintiff alleges that PHEAA did not properly train its employees on investigating identity theft disputes or with FCRA compliance. (*Id.*)

According to the Amended Complaint, the Commonwealth of Pennsylvania established PHEAA in order to aid in the establishment of student loans for its residents. (Am. Compl. ¶ 40.) PHEAA's enabling statute, 24 Pa. Cons. Stat. § 5104, sets out the power of PHEAA's board of directors. (Am. Compl. ¶ 41.) PHEAA also operates under the trade names American Education Services ("AES") and Fed. Loan Servicing ("FLS"). (Am Compl. ¶ 42.) AES and FLS compete nationally for work servicing and collecting on student loans made in states other than Pennsylvania, and by the federal government for residents of states other than Pennsylvania. (*Id.*)

PHEAA entered into contracts with the credit reporting agencies ("CRA") Experian, TransUnion and Equifax.  According to Plaintiff, in order to submit credit-reporting data to the reporting agencies, PHEAA was obligated to agree that it would abide by the FCRA and the rules and regulations of the CRAs. (Am. Compl. ¶ 43.)

B.   Procedural Background

On December 13, 2013, Plaintiff filed his Complaint against PHEAA, alleging violations of the FCRA.  [Dkt. 1.]  On January 13, 2014, Defendant filed its Motion to Dismiss Based on Eleventh Amendment and accompanying memorandum.  [Dkts. 4-5.] On February 2, 2014, Plaintiff filed his Amended Complaint. [Dkt. 8.]  In light of the Amended Complaint, on February 6, 2014, the Court denied as moot Defendant's Motion to Dismiss. [Dkt. 9.]

On February 21, 2014, Defendant filed its Motion to Dismiss the Amended Complaint and accompanying memorandum. [Dkts. 12-13.]  Plaintiff filed his opposition on March 7, 2014. [Dkt. 15.]  Defendant filed its response on March 13, 2014. [Dkt. 16.]

Defendant's Motion to Dismiss is before the Court.

## II.   Standard of Review

Defendant filed its Motion to Dismiss Based on Eleventh Amendment Immunity pursuant to Federal Rules of Civil

4

Procedure 12(b)(1) and 12(b)(6).  The United States Court of Appeals for the Fourth Circuit has not resolved "whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1). *Andrews v. Daw*, 201 F.3d 521, 525 n.2 (4th Cir. 2000).  "The recent trend, however, appears to treat Eleventh Amendment immunity motions under Rule 12(b)(1)."  *Skaggs v. W. Reg'l Jail*, No. CIV. A. 3:13-3293, 2014 WL 66645, at *4 (S.D. W. Va. Jan. 8, 2014) (citations omitted).

To the extent that Eleventh Amendment immunity sounds in subject matter jurisdiction, this would suggest that the burden at this stage falls on the plaintiff because "it is generally a plaintiff's burden to demonstrate subject matter jurisdiction." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2nd Cir. 2006); *see also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Johnson v. Portfolio Recovery Assocs.*, 682 F. Supp. 2d 560, 566 (E.D. Va. 2009).  "To the extent, however, that Eleventh Amendment immunity is viewed as akin to an affirmative defense that a state may assert or waive at its discretion, the burden would appear to fall on the defendant." *Woods,* 466 F.3d at 237.

The Fourth Circuit has not specifically ruled on this question.  In *United States ex rel. Oberg v. Pa. Higher Educ.*

*Assistance Agency*, No. 12-2513 (4th Cir. Mar. 13, 2014) ("*Oberg II*"), however, the court noted that "arm-of-the-state status may well constitute an affirmative defense in the . . . Eleventh Amendment context . . . ."  *Oberg II,* slip op. at 7.  In his opinion concurring in the judgment in part and dissenting in part in *Oberg II*, Judge Traxler stated, "[a]lthough this court has not addressed the issue, circuits that have considered similar assertions of arm-of-state status have uniformly concluded that it is an affirmative defense to be raised and established by the entity claiming to be an arm of the state." *Oberg II,* slip op. at 35 (citing *Sung Park v. Ind. Univ. Sch. of Dentistry,* 692 F.3d 828, 830 (7th Cir. 2012) ("[S]overeign immunity is a waivable affirmative defense."); *Aholelei v. Dep't of Pub. Safety,* 488 F.3d 1144, 1147 (9th Cir. 2007) ("Eleventh Amendment immunity is an affirmative defense . . . ." (internal quotation marks omitted)); *Woods,* 466 F.3d at 237–39 (treating Eleventh Amendment immunity "as akin to an affirmative defense"); *Gragg v. Ky. Cabinet for Workforce Dev.,* 289 F.3d 958, 963 (6th Cir. 2002) ("[T]he entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity, *i.e.,* that it is an arm of the state."); *Skelton v. Camp,* 234 F.3d 292, 297 (5th Cir. 2000) (holding that the party seeking immunity "bear[s] the burden of proof in demonstrating that [it] is an arm of the state entitled to Eleventh Amendment

6

immunity"); *Christy v. Pa. Turnpike Comm'n,* 54 F.3d 1140, 1144 (3d Cir. 1995) ("[T]he party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability.")).

In light of *Oberg II* and the authority from every other circuit to have considered the issue, the Court concludes that PHEAA bears the burden of demonstrating that it is an arm of the state of Pennsylvania. *See also Cash v. United States,* Civil No. WDQ-12-0563, 2012 WL 6201123, at *3 (D. Md. Dec. 11, 2012) (placing the burden of proving Eleventh Amendment immunity on the government entity claiming it); *Hutto v. S.C. Ret. Sys.,* 899 F. Supp. 2d 457, 466 (D.S.C. 2012) ("the burden of persuasion lies with the party asserting the immunity").

### III.  Analysis

Defendant argues that Plaintiff's claim must be dismissed because PHEAA has not waived Eleventh Amendment immunity and consented to this lawsuit.  The Eleventh Amendment provides: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of any Foreign State."  U.S. Const. amend. XI.  By virtue of the Eleventh Amendment, a state is subject to suit in federal court only if (1) the state consents to that suit; or (2) Congress, acting under powers

7

granted to it in section five of the Fourteenth Amendment, has clearly abrogated the state's immunity. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996). A state may consent to be sued in a federal court; however, such consent must be unambiguous. *See Edelman v. Jordan*, 415 U.S. 651, 673 (1973). "Even though the language of the Eleventh Amendment preserves sovereign immunity only of the *States* of the Union, it is well settled that this protection extends also to 'state agents and state instrumentalities' . . . or stated otherwise to 'arm[s] of the State.'" *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001) (citations omitted).

As an initial matter, the Court notes that Plaintiff does not contend that PHEAA has waived sovereign immunity or that Congress has abrogated the state's immunity.[1] Instead, Plaintiff argues that PHEAA is not an arm-of-the-state such that it can assert any immunity. (Pl. Opp'n at 2.) The Court therefore turns to the question of whether PHEAA is an arm of the state of Pennsylvania.

The Fourth Circuit applies a nonexclusive four-factor test to determine whether a governmental entity is an "arm of the state" under the Eleventh Amendment. *Md. Stadium Auth. v.*

---

[1] Plaintiff in his Amended Complaint claims that PHEAA waived its sovereign immunity by entering into contracts with the reporting agencies. (Am. Compl. ¶ 45.) In his memorandum in opposition to Defendant's motion, however, Plaintiff clarifies that his argument is not that PHEAA waived sovereign immunity, but that it cannot assert sovereign immunity in the first instance. (Pl. Opp'n at 23.)

*Ellerbe Becket Inc.*, 407 F.3d 255, 261 (4th Cir. 2005) (citing *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456 (4th Cir. 1987)).  First, the court must consider "whether any judgment against the entity as defendant will be paid by the State."  *United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575, 579 (4th Cir. 2012) ("*Oberg I*") (quoting *S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 303 (4th Cir. 2008)).  Second, the court considers "the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the state retains a veto over the entity's actions." *Id.*  Third, the court assesses "whether the entity is involved with state concerns, as distinct from non-state concerns, including local concerns."  *Id.*  Fourth, the court looks to "how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State."  *Id.*

The precise issue of PHEAA's status as an arm of Pennsylvania has recently come before this Court and the Fourth Circuit.  In *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, No. 01:07-cv-960, 2012 WL 6099086 (E.D. Va. Dec. 5, 2012), Judge Hilton found that PHEAA is an arm of the state of Pennsylvania.  On March 13, 2014, the Fourth Circuit

9

reversed *Oberg. See Oberg II.* The Fourth Circuit found that the Oberg plaintiff had alleged sufficient facts that PHEAA is not an arm of the state for purposes of surviving a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The Fourth Circuit remanded for limited discovery on the question of whether PHEAA is "truly subject to sufficient state control to render [it] a part of the state." *Oberg II*, slip op. at 18-19 (quoting *Oberg I*, 681 F.3d at 579).

> A.   State Treasury

The first arm-of-the state factor is whether the state treasury will be responsible for paying any judgment that might be awarded. *Ram Ditta*, 822 F.2d at 457. In *Oberg II,* the Fourth Circuit found that this factor weighed strongly against finding PHEAA to be a state agency. *Oberg II*, slip op. at 18. For purposes of this motion, PHEAA concedes this factor, stating: "[d]espite its disagreement with this conclusion, PHEAA sees no reason to re-litigate the treasury factor on this motion, given that it need not 'satisfy' all four factors in order to be considered a state agency." (Def. Reply at 3); *see Oberg I*, 681 F.3d at 580 n.3 ("We note that although in the past we have referred to the first factor as 'the most important consideration,' *Ram Ditta,* 822 F.2d at 457, more recent Supreme Court precedent suggests that the first factor does not deserve such preeminence, *see, e.g. Fed. Maritime Comm'n v. S.C. Ports*

10

*Auth.*, 535 U.S. 743, 122 S. Ct. 1864, 152 L. Ed. 2d 962 (2002).").

The Fourth Circuit noted that the Pennsylvania treasury is "neither legally nor functionally liable for any judgment against PHEAA." *Oberg II*, slip op. at 12. Pennsylvania law provides that "no obligation of [PHEAA] shall be a debt of the State." 24 Pa. Cons. Stat. § 5104(3). PHEAA's funds are held in a "segregated account apart from general state funds." *Id.* at 13 (citing 24 Pa. Cons. Stat. § 5105.10). PHEAA would pay a judgment against it from its own "moneys from its segregated fund." *Id.* at 14 (citing 24 Pa. Cons. Stat. § 5104(3) (2012)). Likewise, Plaintiff argues that PHEAA would pay a judgment in this case out of its operating account, and not the state treasury.[2] (Pl. Opp'n at 6, 11.)

Because PHEAA does not dispute these findings for present purposes, the Court will adopt the Fourth Circuit's conclusion that the first factor points strongly in the direction of finding that PHEAA is not an arm of the state. Indeed, historically the first factor was regarded as "the most important consideration." *Ram Ditta*, 822 F.2d at 457. While the state treasury factor no longer deserves "dispositive

---

[2] Specifically, Plaintiff alleges that PHEAA maintains a regular deposit account with M&T Bank. (Am. Compl. ¶¶ 48, 49.)

preeminence," this factor "remains of considerable importance."
*Oberg II,* slip op. at 8 n.4 (citations omitted).

      B.   <u>Degree of Autonomy</u>

      Second, the court must consider "the degree of
autonomy exercised by the entity, including such circumstances
as who appoints the entity's directors or officers, who funds
the entity, and whether the State retains a veto over the
entity's actions." *Oberg II*, slip op. at 10 (quoting *Oberg I*,
681 F.3d at 580). The Court also considers whether the entity
"has the ability to contract, sue and be sued, and purchase and
sell property . . . and whether it is represented in legal
matters by the state attorney general." *Oberg II*, slip op. at
10 (citations omitted).

      In *Oberg II*, the Fourth Circuit found that in the
context of a motion to dismiss under 12(b)(6), this second
factor "counsels against holding that PHEAA is an arm of the
state" although the relevant facts cut both ways. *Oberg II,*
slip op. at 15. The court noted that under state law, state
officials have "some degree of veto power over PHEAA's
operations." *Id.* at 14. The Auditor General may review PHEAA's
activities, and PHEAA must seek approval of the Governor to
issue notes and bonds. 24 Pa. Cons. Stat. §§ 5108, 5104(3). On
the other hand, PHEAA is financially independent, and "has the
power to enter into contracts, sue and be sued, and purchase and

12

sell property in its own name, all of which suggest operational autonomy." *Oberg II,* slip op. at 15.

PHEAA urges the Court to find that on the facts presented here, PHEAA has minimal autonomy.  PHEAA argues that Plaintiff has alleged facts beyond those considered by the Fourth Circuit such that this Court can conclude that PHEAA exercises little autonomy.  (Def. Reply at 6.)  First, PHEAA points to Plaintiff's allegation that Pennsylvania's Attorney General needed to approve the terms of PHEAA's settlement of prior FCRA cases.  (Am. Compl. ¶ 46.)  Second, PHEAA notes that Pennsylvania's Attorney General approved its contracts with credit reporting agencies in writing.  (Def. Mem. Ex. B, Ex. C, Ex. D.)  Third, PHEAA points to its testimony before the Appropriations Committee of the Pennsylvania legislature, as evidence of state control over PHEAA.  (Pl. Opp'n Ex. A, Ex. B.)

The additional facts presented by PHEAA are not sufficient for PHEAA to carry its burden.  In *Oberg II*, the Fourth Circuit focused heavily upon PHEAA's financial independence, noting that it receives no operational funding from the state.  PHEAA has not provided any evidence to the contrary.  Indeed, PHEAA has stated that its "success as a student loan servicer and guarantor" allows the agency to self-fund its operations and service to Pennsylvania.  (Pl. Opp'n Ex. A.)  On February 20, 2013, PHEAA reported that in the 2012-2013

13

fiscal year, PHEAA provided Pennsylvania with $75 million to supplement its student aid program.  (Pl. Opp'n Ex. A.)  In the current fiscal year PHEAA has provided Pennsylvania with a $90 million supplement to the student aid program.  (Pl. Opp'n Ex. B.)  Moreover, under Pennsylvania law PHEAA has significant discretion in its use of funds.  PHEAA's funds may be used at the direction of its board of directors "for carrying out any of the corporate purposes of the agency."  24 Pa. Cons. Stat. § 5104(3).

PHEAA's argument that the Pennsylvania Attorney General approved its settlements and contracts, while certainly relevant, does not appear to indicate a true lack of operational independence.  Under Pennsylvania law, the Attorney General represents all commonwealth agencies in civil litigation; the Attorney General, may, however, authorize "the General Counsel or the counsel for an independent agency to initiate, conduct, or defend any particular litigation or category of litigation in his stead."  71 P.S. § 732-204(c).  Based on PHEAA's representation in the instant litigation, the Court is not convinced that Pennsylvania retains operational control over the agency's legal affairs.  In *Maryland Stadium Authority*, for example, the court noted that the University of Maryland was represented by the state Attorney General, as evidence of state control.  *Md. Stadium Auth.*, 407 F.3d at 264; *see also Cash*, 242

14

F.3d at 225 (noting that the school board at issue was represented by "its private counsel, and not by the Attorney General" as evidence of agency autonomy).  Here, PHEAA is represented by its private counsel – not the Attorney General.

PHEAA's argument that the makeup of its board of directors is evidence of state control is stronger.  PHEAA states that sixteen members of its board are members of the Pennsylvania General Assembly or legislative appointees, "one is the Secretary of Education, who is appointed by the Governor; and three are also gubernatorial appointees."  (Def. Reply at 5 n.6.)  As the Fourth Circuit noted in *Oberg II*, "such an arrangement frequently indicates state control."  *Oberg II,* slip op. at 14 (citing *Md. Stadium Auth.*, 407 F.3d at 624.)  PHEAA argues, therefore, that state officials control the board and exercise a de facto veto, as in *Hoover*.  *See Hoover*, 535 F.3d at 307 (noting that "all of the Budget and Control Board's members *are* state officials" as evidence that the State retains "ultimate veto power") (emphasis in original).

However, Pennsylvania law has changed from that considered in *Oberg II*.  Pursuant to a 2010 amendment, four seats on PHEAA's board will come to be filled by "nonlegislative individual[s] that [have] relevant experience in a field related to finance, banking, investment, information technology, higher education or higher education finance."  71 P.S. § 111.2.  On

the record before the Court, it is not clear how many, if any, of PHEAA's current board members are nonlegislative individuals. Nevertheless, this statutory change suggests that state control over PHEAA is more removed than in *Hoover*, where the board members were, by statute, the "Governor, the State Treasurer, the Comptroller General, the Chairman of the Senate Finance Committee, and the Chairman of the House Ways and Means Committee." *Hoover*, 535 F.3d at 307.

Taken all together, the second arm-of-the-state factor does not weigh strongly either in favor of, or against PHEAA. PHEAA's financial independence strongly suggests that it is not an arm of the state. Pennsylvania's appointment of PHEAA's board members and the Attorney General's involvement in its operations points in the other direction, although perhaps not as strongly as during the time period considered by *Oberg*, given the intervening statutory change.

### C.   Local Versus Statewide Concerns

Third, the court must consider "whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns." *Oberg II*, slip op. at 10. "Non-state concerns, however, do not mean only local concerns, but rather also encompass other non-state interests like out-of-state operations." *Id.* (internal quotation marks omitted) (emphasis in original). Pennsylvania created PHEAA to "improve

16

the higher educational opportunities" for the residents of the
State.  24 Pa. Cons. Stat. § 5102.  "Higher education is an area
of quintessential state concern and a traditional state
governmental function." *Md. Stadium Auth.*, 407 F.3d at 266.  As
the Fourth Circuit noted, while PHEAA does not directly provide
higher education, "it nonetheless facilitates the attainment of
education by supplying student financial aid services.  This
work is clearly of legitimate state concern." *Oberg II*, slip
op. at 16.

        Plaintiff argues, however, that PHEAA is engaged in
"debt servicing activities outside the state that have
absolutely no connection with Pennsylvania."  (Pl. Opp'n at 10.)
Plaintiff contends that PHEAA's loan servicing arm works on a
variety of loans, the majority of which do not involve
Pennsylvania residents.  (Pl. Opp'n at 12-13.)  Moreover,
Plaintiff argues, "servicing payments on current loans,
collecting on defaulted loans and credit reporting" are not
state functions.  (Pl. Opp'n at 13.)

        In *Oberg II,* the court considered a similar argument –
that PHEAA's activities were "so focused <u>out of state</u> that PHEAA
was not involved <u>primarily</u> with state concerns." *Oberg II*, slip
op. at 16 (emphasis in original); *see Ram Ditta*, 822 F.2d at 459
("A third factor given weight in this equation is whether a
political entity is involved primarily with local or state-wide

17

concerns."). The court looked at PHEAA's operations in 2005, noting that because only one-third of PHEAA's earnings came from out of state, it did not seem plausible that by 2006 – the last year covered by the relator's allegations – PHEAA's operations would be focused primarily out of state. *Oberg II*, slip op. at 17.

Here, by contrast, Plaintiff's allegations arise out of PHEAA's conduct in 2013. On the record before the Court, it is not clear that PHEAA's 2013 loan servicing activities were focused primary within the state. PHEAA is engaged in business nationwide as a federal guarantor and commercial servicer of federal student loans. (Pl. Opp'n Ex. B.) At present, PHEAA manages student loans for more than 12 million borrowers throughout the country. (*Id.*) Notably, PHEAA recently won transfer of $717 million in loans and 82,400 borrowers from the Georgia Higher Education Assistance Corporation. (Pl. Opp'n Ex. A.) Moreover, in *Oberg II*, the majority noted the possibility of a distinction between student-loan financing and the servicing of federal student loans, but found that it was not relevant to the agency in question. *Oberg II,* slip op. at 29 (discussing the Arkansas Student Loan Authority ("ASLA")).[3]

---

[3] Indeed, in his opinion concurring in the judgment in part and dissenting in part in *Oberg II,* Judge Traxler noted "ASLA is also engaged in other, more commercial activities, such as the buying and selling of loan pools on the secondary market and the servicing of federal student loans, that are arguably more appropriately characterized as "non-state concerns." *Oberg II,*

Given the distinction between student loan financing, and servicing federal student loans nationwide, the Court cannot conclude that PHEAA has met its burden on this factor.  PHEAA has not provided sufficient evidence for the Court to conclude that its 2013 operations were focused "<u>primarily</u>" in Pennsylvania.  *Oberg II*, slip op. at 16.  Moreover, contrary to PHEAA's assertions, the fact that its income is used to support higher education in Pennsylvania is not dispositive of this factor.[4]  (Def. Reply at 8.)  In *Oberg II*, the Fourth Circuit gave significant consideration to where a state agency's operations "centered," *Oberg II,* slip op. at 22; the court did not suggest that the use of funds for in-state residents is entirely determinative.

---

slip. op. at 55 (citing *Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico*, 322 F.3d 56, 64 (1st Cir. 2003) ("Not all entities created by states are meant to share state sovereignty . . . . Some entities may be meant to be commercial enterprises, viable and competitive in the marketplace in which they operate.")); *see also United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 720 (10th Cir. 2006) ("When a state forms an ordinary corporation, with anticipated and actual financial independence, to enter the private sector and compete as a commercial entity, even though the income may be devoted to support some public function or use, that entity is not an arm-of-the-state.")

[4] PHEAA cites to *College Savings Bank* in support of the proposition that its interstate commercial activities do not affect its Eleventh Amendment rights. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 671 (1999).  In *College Savings Bank*, the Court stated: "[n]or do we think that the constitutionally grounded principle of state sovereign immunity is any less robust where, as here, the asserted basis for constructive waiver is conduct that the State realistically could choose to abandon, that is undertaken for profit, that is traditionally performed by private citizens and corporations, and that otherwise resembles the behavior of 'market participants.'"  *Id.* at 684.  In *College Savings Bank*, however, the question of whether the Florida Prepaid Postsecondary Education Expense Board was an arm of the state was not at issue; the case concerned constructive waiver of sovereign immunity.

D.    <u>State Law</u>

Fourth, the court must consider how the entity is treated under state law. "Although the question of whether an entity is an alter ego of the state is a question of federal, not state, law, the manner in which state law addresses the entity remains important, and potentially controlling." *Md. Stadium Auth.*, 407 F.3d at 264 (citations omitted). In this analysis, a court may consider "both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question." *Id.*

This factor weighs clearly in support of PHEAA's contention that it is an arm of the state. Pennsylvania law provides that the "creation of the agency [PHEAA] is in all respects for the benefit of the people of the Commonwealth, for the improvement of their health and welfare, and for the promotion of the economy, and . . . such purposes are public purposes and the agency will be performing an essential government function." 24 Pa. Cons. Stat. § 5105.6. As the Fourth Circuit noted in *Oberg II*, "PHEAA's enabling legislation was made effective by 'amendment to the Constitution of Pennsylvania authorizing grants or loans for higher education,' *id.* § 5112, and Pennsylvania state courts have concluded that PHEAA is a state agency for jurisdictional purposes . . . ."

20

*Oberg II,* slip op. at 18.   Moreover, Pennsylvania's Commonwealth Court, which has original jurisdiction over cases to which Pennsylvania or its officers are party, has found that PHEAA is an agency of the Commonwealth.  *See Richmond v. PHEAA*, 297 A.2d 544, 546 (Pa. Commw. Ct. 1972).  Accordingly, it is clear that under Pennsylvania law, PHEAA is treated as a state agency.

In sum, while the first and fourth factors are clear on the record before the Court – and point in opposite directions – the second and third factors are not.  Weighing these factors all together, PHEAA has not met its burden of showing that it is entitled to Eleventh Amendment immunity at this stage.  The Court will deny PHEAA's motion.

## IV.  Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion to Dismiss.

An appropriate Order will issue.


|  | /s/ |
| --- | --- |
| April 2, 2014 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |