IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
LEE PELE,                         )
                                  )
      Plaintiff,                  )
                                  )
           v.                     )    1:13cv1531 (JCC/TRJ)
                                  )
PENNSYLVANIA HIGHER EDUCATION     )
ASSISTANCE AGENCY, d/b/a          )
American Education Services,      )
                                  )
      Defendant.                  )
```

## M E M O R A N D U M   O P I N I O N

The Court must decide whether the Pennsylvania Higher Education Assistance Agency ("Defendant" or "PHEAA") is an "arm of the state" of Pennsylvania, such that it would enjoy immunity from suit under the Eleventh Amendment to the Constitution.  Now before the Court is PHEAA's Motion for Summary Judgment on that affirmative defense of immunity, [Dkt. 57], and Plaintiff Lee Pele's ("Plaintiff" or "Pele") cross-motion for Partial Summary Judgment, [Dkt. 68].  For the following reasons, the Court holds that PHEAA is an arm of the state of Pennsylvania and entitled to immunity under the Eleventh Amendment.  Therefore, the Court will grant PHEAA's Motion for Summary Judgment.

### I. Background

#### A. Factual Background

This case arises out of alleged violations of the Fair

1

Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 <u>et</u> <u>seq.</u> Pele, a resident and citizen of Virginia, alleges that he received federal student loans that were serviced by PHEAA, a company that furnishes information to consumer reporting agencies as contemplated by FCRA.  (Am. Compl. [Dkt. 8] ¶¶ 1-3.)  Pele claims that PHEAA listed defaulted student loans on his credit file that "he never authorized, initiated, received the proceeds [from] or guaranteed."  (<u>Id.</u> ¶¶ 5, 6.)  Consequently, Pele received phone calls from debt collector Windham Professionals ("Windham") seeking over $137,000 in defaulted student loans. (<u>Id.</u> ¶ 7.)  Pele maintained that he "did not initiate, guaranty, or receive any benefit" from these loans.  (<u>Id.</u>)  Pele sent credit dispute letters to credit reporting agencies TransUnion, Equifax, and Experian.  (<u>Id.</u> ¶ 14.)  In response, the credit reporting agencies sent four Automated Credit Dispute Verifications ("ACDV") to PHEAA.  (<u>Id.</u> ¶¶ 21-23.)  PHEAA responded to all four ACDVs "by modifying, but not deleting, the information from Mr. Pele's credit file."  (<u>Id.</u> ¶ 24.)  Pele alleges that as a result, "PHEAA continued to attribute debts to Mr. Pele to the credit reporting agencies."  (<u>Id.</u>)

B. Procedural Background

Pele filed the original complaint in this matter on December 13, 2013, [Dkt. 1], and filed an amended complaint as a matter of right under the federal rules on February 3, 2014

2

[Dkt. 8].  PHEAA moved to dismiss the amended complaint, arguing that PHEAA is an arm of the Commonwealth of Pennsylvania ("Commonwealth" or "State") and entitled to immunity under the Eleventh Amendment.  [Dkt. 12]  The Court addressed this question by applying the Fourth Circuit's nonexclusive four-factor test.  (Mem. Op. [Dkt. 18] at 8-21 (citing Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255 (4th Cir. 2005)); see also U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131 (4th Cir. 2014) ("Oberg II").)  This Court concluded that PHEAA did not meet its burden of showing an entitlement to Eleventh Amendment immunity "at this stage," (Mem. Op. at 21.), and denied the motion to dismiss, (Order Denying Mot. to Dismiss [Dkt. 19]).

On August 21, 2014, PHEAA filed its Motion for Summary Judgment [Dkt. 57] and accompanying brief in support [Dkt. 58].  Before filing an opposition brief, Pele filed his own cross-motion for Partial Summary Judgment [Dkt. 68] on PHEAA's sovereign immunity affirmative defense, and on five other affirmative defenses asserted by PHEAA, with an accompanying brief in support [Dkt. 69] on September 4, 2014.  Both parties timely filed opposition [Dkts. 77, 86] and reply briefs [Dkt. 84, 89].  The Court entertained oral argument on September 25, 2014.  Having been fully briefed and argued, the motions are now before the Court.

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Evans v. Techs. Applications & Serv., Co., 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted). When moving for summary judgment on an affirmative defense, such as sovereign immunity under the Eleventh Amendment, the defendant "must conclusively establish all essential elements of that defense." Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc., 673 F.3d 294, 299 (4th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986)). If the affirmative defense is supported by sufficient evidence, the burden then shifts to the plaintiff, who must "come forward with specific facts showing that there is a genuine issue for trial." Ray Commc'ns, Inc., 673 F.3d at 299 (citations and quotation marks omitted).

The absence or presence of a genuine dispute as to any material fact must be supported either by "citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)-(B). While the Court "must draw any inferences in the light most favorable to

4

the non-movant," <u>Brock v. Entre Computer Ctrs.</u>, 933 F.2d 1253,

1259 (4th Cir. 1991) (citations omitted), the non-movant "cannot

create a genuine issue of material fact through mere speculation

or the building of one inference upon another." <u>Beale v. Hardy</u>,

769 F.2d 213, 214 (4th Cir. 1985); <u>see also</u> <u>Anderson</u>, 477 U.S.

at 248-52 (finding the very existence of a scintilla of evidence

or of unsubstantiated conclusory allegations insufficient to

avoid summary judgment).  Rather, a genuine issue exists when

there is sufficient evidence on which a reasonable jury could

return a verdict in favor of the non-moving party.  <u>Id.</u>

        Specifically in this Court, on summary judgment, the

parties are required to list the undisputed material facts.

E.D. Va. Local Civil Rule 56(B).  "In determining a motion for

summary judgment, the Court may assume that facts identified by

the moving party in its listing of material facts are admitted,

unless such a fact is controverted in the statement of genuine

issues filed in opposition to the motion."  <u>Id.</u>  Similarly,

"[i]f a party fails to properly support an assertion of fact or

fails to properly address another party's assertion of fact as

required by Rule 56(c), the court may consider the fact

undisputed for purposes of the motion."  Fed. R. Civ. P.

56(e)(2).  Where there is conflicting evidence, the court must

credit the evidence of both sides and acknowledge that there is

a genuine issue of material fact that cannot be resolved by

summary judgment.  See Tolan v. Cotton, 134 S. Ct. 1861, 1868-69
(2014) ("By weighing the evidence and reaching factual
inferences contrary to [the non-movant's] competent evidence,
the court below neglected to adhere to the fundamental principle
that at the summary judgment stage, reasonable inferences should
be drawn in favor of the nonmoving party.")

### III. Analysis

        PHEAA argues that it is entitled to judgment as a
matter of law because Pele's claims are barred by Eleventh
Amendment immunity.  The analysis begins just as it did for
PHEAA's motion to dismiss.  The Eleventh Amendment to the United
States Constitution provides: "The Judicial power of the United
States shall not be construed to extend to any suit in law or
equity, commenced or prosecuted against one of the United States
by Citizens of another State, or by Citizens or Subjects of any
Foreign State."  U.S. Const. amend. XI.  Accordingly, a state is
only subject to suit in federal court if (1) the state
unambiguously consents to that suit or (2) Congress, acting
under powers granted to it in section five of the Fourteenth
Amendment, has clearly abrogated the state's immunity.  See
Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54-55 (1996).
Relevant to this matter, "it is well settled that this
protection extends also to 'state agents and state
instrumentalities' . . . or stated otherwise to 'arm[s] of the

State.'"  Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219,
222 (4th Cir. 2001) (citations omitted).

It is undisputed that PHEAA has not waived sovereign
immunity and that Congress has not abrogated the state's
immunity.  Rather, PHEAA contends that after discovery, the
evidence shows that there is no genuine issue as to any material
fact, and that PHEAA is entitled to judgment as a matter of law
because it is an arm of the state of Pennsylvania and entitled
to Eleventh Amendment immunity.  In his opposition, Pele relies
heavily on this Court's Memorandum Opinion regarding the motion
to dismiss and the Fourth Circuit's opinion in Oberg II.
However, both opinions addressed motions to dismiss.  And in
Oberg II, the Fourth Circuit remanded the case to this Court for
limited discovery on the precise issue now before the Court:
whether PHEAA is "truly subject to sufficient state control to
render [it] a part of the state."  735 F.3d at 141.

Now that discovery has closed in this matter, with a
more complete record, the Court again turns to the nonexclusive
four-factor test used by the Fourth Circuit to determine whether
PHEAA, a governmental entity, is an "arm of the state" under the
Eleventh Amendment and entitled to immunity.  Md. Stadium Auth.
v. Ellerbe Becket Inc., 407 F.3d 255, 261 (4th Cir. 2005)
(citing Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n,
822 F.2d 456 (4th Cir. 1987)).

7

A. State Treasury

When the entity is a defendant, like PHEAA is here, the first arm-of-the-state factor is "whether any judgment against the entity as defendant will be paid by the State." Oberg II, 745 F.3d at 136-37 (citations omitted).  This includes functional liability, "even if the state is not legally liable." Id.  at 137 (quoting Stoner v. Santa Clara Cnty. Office of Educ., 502 F.3d 1116, 1122 (9th Cir. 2007); see also Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 50 (1994) ("Where an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency.")).  While the state treasury factor no longer deserves "dispositive preeminence . . . [it still] remains of considerable importance."  Oberg II, 745 F.3d at 137 n.4 (citations and quotation marks omitted).

In Oberg II, the Fourth Circuit held that "because state law instructs that PHEAA would pay any judgment in this case with its own moneys from its segregated fund . . . the first factor weighs heavily against holding that PHEAA is an arm of the state."  745 F.3d at 139 (citing 24 Pa. Stat. § 5104(3)). The Fourth Circuit primarily relied on the statutory directives of 24 Pa. Stat. § 5104(3) ("[N]o obligation of the agency shall

8

be a debt of the State . . . ."), and 24 Pa. Stat. § 5105.10 (establishing the Educational Loan Assistance Fund ("ELAF")), to conclude that the first factor weighs heavily against sovereign immunity.

In reviewing de novo the district court's dismissal under Rule 12(b)(6), however, the record before the court was not fully developed, as it is now.

Therefore, even in light of the statutory directive that "no obligation of the agency shall be a debt of the State," the Court finds with the benefit of discovery, that Pennsylvania would be functionally liable for a judgment against PHEAA.  See Oberg II, 745 F.3d at 137 (citing Hess, 513 U.S. at 50). Accordingly, the first factor weighs in favor of holding that PHEAA is an arm of the state.

In the record now before the Court, it is undisputed that a judgment against PHEAA would be paid with the Commonwealth's money from the Pennsylvania Treasury Department ("State Treasury").  (Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br."), Ex. 1 [Dkt. 58-2] ("Adolph Decl.") ¶ 11 ("A monetary judgment against PHEAA would be paid with the Commonwealth's money."); Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. A [Dkt. 77-1] ("Guenther Depo.") at 70-72 (answering in the affirmative that the judgment in this case will be paid by the State Treasurer out of the PHEAA

9

Discretionary Fund, which is the money that PHEAA initially put into that account).)  Pele argued in his opposition to the motion to dismiss that PHEAA would pay a judgment in this case out of a separate operating account and not the State Treasury, (Mem. Op. at 11.), and he persists in this argument in opposition to summary judgment, but without the requisite factual support in the record.  (See Pl.'s Opp'n at 15-19.)  The undisputed facts in the record, mainly supported by the deposition and declaration of Mr. Timothy Guenther, PHEAA's Chief Financial Officer, establish that any judgment against PHEAA would be paid with state funds from the State Treasury.

First, all of PHEAA's revenues or earnings are deposited into the State Treasury.  (Def.'s Br. at 24, Statement of Fact ("Stmt. Fact") ¶ 22 (citing 24 Pa. Stat. § 5104(3); Guenther Dep. at 71).)  Pele unsuccessfully attempts to dispute this fact by stating it is "not supported by the record," and by arguing that PHEAA's funds are separately stored in banks and not comingled with tax revenues.  (Pl.'s Opp'n at 6 (citing to various portions of Mr. Guenther's deposition).)  However, Mr. Guenther's testimony regarding PHEAA's funds and the State Treasury can be summarized as follows: PHEAA maintains seven separate bank accounts, six with M&T Bank and one with Metro

10

Bank.[1]  (Guenther Dep. at 41.)  The M&T accounts generally assist the State Treasury in "handling items,"[2] while the Metro Bank account contains separate federal funds.  (Id.)   PHEAA's revenues are eventually routed through the bank accounts to the State Treasury, which then invests the money in various funds, including PHEAA's Discretionary Fund, from which any settlements or judgments would be paid.  (Id. at 51-55.)

In fact, Pele admits that all revenues into, or payments out of, PHEAA's separate bank accounts are eventually accounted for by the State Treasury.  (Pl.'s Opp'n at 6-7 (admitting Stmt. Fact ¶ 25 while contesting PHEAA's annual financial reports); but see Def.'s Reply at 13 (breaking down annual financial report).)  It is undisputed that

> [t]he money that PHEAA receives from borrowers for the loans it services does not go immediately into the Treasury.  Instead, the borrowers pay PHEAA, which deposits the funds into bank accounts from which it makes payments to actual lenders.  PHEAA then deposits its servicing fees into the Treasury.  [And pursuant to federal regulation,] PHEAA manages a reserve fund that belongs to the Federal Government for

---

[1] In addition to the operations account, PHEAA maintains an advance account, a "COMPASS" account, a reimbursement account, a loan origination account, and a dormant account, all with specific purposes.  (Id. at 43-45.)

[2] PHEAA uses the bank accounts to route payments into and out of the State Treasury.  For instance, any money that gets deposited into the M&T accounts, like a client paying servicing fees, once cleared, "goes to the State Treasury."  (Id. at 42, 43, 45.)  Conversely, any money PHEAA needs to pay out, like a vendor's bill, will be paid out through one of the M&T accounts, with the State Treasury later transferring the requisite funds into the account.  (Id. at 42 (discussing "backfunding").)  Use of M&T accounts are "[p]urely a convenience to the State Treasurer," to facilitate operational transactions.  (Id.)

> the defaulted loans that are guaranteed by
> the Federal Government, but which PHEAA
> collects.   The Government pays PHEAA a fee
> for its service, and PHEAA deposits the fees
> into the Commonwealth Treasury.

(Def.'s Br. at 15, Stmt. Fact ¶ 25 (citing Ex. 3 [Dkt. 58-4,

corrected at Dkt. 78] ("Guenther Decl.") ¶¶ 28-29; Guenther Dep.

at 41-45).)[3]   In sum, the undisputed evidence in the record shows

that PHEAA utilizes separate bank accounts, just like other

State agencies, to facilitate day-to-day operations, but

ultimately, the funds are routed into and out of the State

Treasury.  By failing to cite evidence other than Mr. Guenther's

deposition, Pele fails to raise a genuine issue as to this

material fact, and therefore it is undisputed.  Fed. R. Civ. P.

56(e)(2).

Second, even though a portion of PHEAA funds are

earmarked for the ELAF, PHEAA's revenues are comingled within

the State Treasury's general fund and the State Treasurer

invests this money as part of the State's funds.  (Def.'s Br. at

14, Stmt. Fact ¶ 22 (citing Ex. 4 [Dkt. 58-5] ("Craig Decl.") ¶

5; Guenther Decl. ¶ 25).)   In Oberg II, the Fourth Circuit found

---

[3] Compare Stmt. Fact ¶ 27 (discussing PHEAA's requisition process with the
State Treasury) and Stmt. Fact ¶ 28 (discussing the State Treasury
"backfunding" process), with Pl.'s Opp'n at 7 ("[As to Stmt. Fact ¶ 27 a]dmit
that the witness did say that is the way that funds held within the state
treasury need to be handled. . . . [As to Stmt. Fact ¶ 28 d]enied as phrased.
Mr. Guenther will use the operating account to pay a PHEAA Invoice: 'To
assist the State Treasury in handling a payment quicker than the State
Treasury was prepared to handle it.'").  Pele fails to raise a genuine
dispute regarding the processing of PHEAA revenues and payments into and out
of the State Treasury.

that "PHEAA's funds are held in a segregated account apart from general state funds."  745 F.3d at 138-39 (citing 24 Pa. Stat. § 5105.10 ("There is hereby created a fund within the State Treasury to be known as the Educational Loan Assistance Fund.") (emphasis in original)).  The evidence now in the record illustrates with greater detail how the State Treasury holds and invests state funds, including those attributable to PHEAA.

> [M]onies that PHEAA receives through lending, loan servicing, loan guaranteeing and debt issuances are deposited into the Treasury of the Commonwealth, designated as Commonwealth Fund 79 - the Education Loan Assistance Fund ("ELAF").  Like other state agencies, PHEAA's funds are pooled for investment purposes with other funds, including the Commonwealth's General Fund. The Treasurer invests PHEAA's funds in short-term, liquid assets (Investment Pool 99) and long term investments (Investment Pool 198).

(Craig Decl. ¶ 5.)  In other words, even though ELAF money is "segregated 'on paper' as earmarked funds . . . [t]he money itself is mingled with the Commonwealth's general funds; the Treasurer includes the funds in the money he or she invests on behalf of the Commonwealth."  (Guenther Decl. ¶ 25.)  The undisputed[4] evidence before the Court shows that while PHEAA revenues are earmarked for the ELAF fund, the money itself is

---

[4] Pele does not dispute this fact, but questions the amount of money held in ELAF, as compared to PHEAA's Annual Financial Report.  (See Pl.'s Opp'n at 6.)  Pele does not cite to another portion of the record to raise a genuine issue as to whether PHEAA's revenues are comingled and invested within the Treasury's general fund; thus it is undisputed.  Fed. R. Civ. P. 56(e)(2).

still comingled and invested along with other general state funds in the State Treasury.  Cf. Oberg II, 745 F.3d at 139 (quoting Blake v. Kline, 612 F.2d 718, 723 (3d Cir. 1979) (remanding for further consideration because the entity's fund was "set apart in the state treasury from general state funds and . . . administered by the State Treasurer at the discretion of the Board.")).

Moreover, while PHEAA's revenues "shall be deposited in the State Treasury and may be utilized at the discretion of the board of directors for carrying out any of the corporate purposes of the agency," 24 Pa. Stat. § 5104(3), PHEAA must first receive approval from the State Treasurer before PHEAA can spend money, just like every other state agency.  (Def.'s Br. at 15, Stmt. Fact ¶ 26 (citing Craig Decl. ¶ 6 ("The Treasurer treats PHEAA like any other Commonwealth agency.  Specifically, before PHEAA can spend any of the money that is deposited into the Treasury, it must first receive approval from the Treasurer or his/her staff."); Guenther Dep. at 68, 71 ("I believe all of our revenues must be deposited to State Treasury.  The State Treasurer decides what gets disbursed.  If PHEAA is dissolved, the money goes to the Commonwealth of Pennsylvania. These are Commonwealth assets.")); see also Guenther Decl. Ex. B. [Dkt. 78] at 36 (Fiscal Examiner from State Treasury asking PHEAA for itemized receipt from restaurant to ensure alcohol was not

14

ordered, and to prevent improper use of state funds).)  Pele
denies this material fact, but in support, baldly asserts that
"PHEAA does not need approval to spend the money that is not in
the state treasury," and cites only to the same lines of Mr.
Guenther's deposition.  (Pl.'s Opp'n at 7 ("The corporate
representative on this topic and the CFO can only say that he
'believes' the money has to be deposited into the state
treasury.").)  But Pele does not offer any evidence to
contradict, or genuinely dispute, the evidence in the record.
Thus, it is also undisputed that PHEAA must first receive
approval from the State Treasurer before PHEAA can spend money,
just like any other state agency in Pennsylvania.  Fed. R. Civ.
P. 56(e)(2) ("If a party fails . . . to properly address another
party's assertion of fact as required by Rule 56(c), the court
may consider the fact undisputed for purposes of the motion.").

Third, upon PHEAA's dissolution, "all the property and
moneys . . . shall become the property of the Commonwealth."
(Def.'s Br. at 15, Stmt. Fact ¶ 24 (citing 24 Pa. Stat. § 5109;
Guenther Dep. at 71 ("If PHEAA is dissolved, the money goes to
the Commonwealth of Pennsylvania.  These are Commonwealth
assets.")).)  Pele does not contest this material fact and
therefore it is undisputed.  (Pl.'s Opp'n at 6.).

Lastly, the Court finds that any judgment against
PHEAA "would directly interfere with the state's fiscal

15

autonomy." Md. Stadium Auth., 407 F.3d at 264 (citation

omitted).  Pennsylvania State Representative William Adolph,

Jr., the Chairman of PHEAA's Board of Directors and the Chairman

of the House of Representatives Appropriations Committee,

succinctly stated the effect of a monetary judgment against

PHEAA, and the choice the Pennsylvania state government would

then face.

> A monetary judgment against PHEAA would be
> paid with the Commonwealth[']s money.  It
> would also impact the amount of money that
> PHEAA would be paid with the Commonwealth's
> grant programs and its ability to administer
> those programs, as well as impact the amount
> of revenue it uses for all the other public
> service programs it offers.  Specifically,
> if a significant judgment were entered
> against PHEAA, the General Assembly would
> have no choice but to appropriate money (as
> it has done in the past) to PHEAA to allow
> for its continued operation or substantially
> reduce or do away with its grant programs.

(Def.'s Br. Ex. 1 [Dkt. 58-2] ("Adolph Decl.") ¶ 11.); cf. S.

Carolina Dep't of Disabilities & Special Needs v. Hoover

Universal, Inc., 535 F.3d 300, 306 (4th Cir. 2008) (holding

district courts must focus on the "broader inquiry [of] . . .

whether recovery here would inure to the benefit of the State,"

and not celebrate form over substance by looking at whether

those funds are segregated from the general treasury) (emphasis

in original).  In light of the undisputed facts regarding

PHEAA's revenues and funds as discussed above, the Court finds

16

that the State would be functionally liable for a judgment against PHEAA.  Oberg II, 745 F.3d at 136-37 (citations omitted).  Therefore, because this factor still "remains of considerable importance," id. at 137 n.4, the Court finds that the first arm-of-the-state factor weighs in PHEAA's favor.

### B. Degree of Autonomy

Second, the Court considers "the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions."  Id. at 137 (quoting U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp., 681 F.3d 575, 580 (4th Cir. 2012) ("Oberg I") (additional citation omitted)).  Also relevant to this factor "is the determination whether an entity has the ability to contract, sue and be sued, and purchase and sell property . . . and whether it is represented in legal matters by the state attorney general."  Oberg II, 745 F.3d at 137 (citations omitted).

Several undisputed facts suggest that PHEAA maintains autonomy from the State.  Most notably, it is undisputed that PHEAA has been financially independent from the State since 1988.  The Pennsylvania General Assembly has not appropriated any tax dollars for PHEAA's operating expenses, and thus PHEAA is entirely self-sufficient.  (Def.'s Br. at 14, Stmt. Fact ¶ 19

(citing Guenther Decl. ¶ 22; Adolph Decl. ¶ 10); see also Pl.'s
Opp'n at 5, 19.)  This "strongly suggest[s] that PHEAA is not an
arm of the state." Oberg II, 745 F.3d at 139.  Moreover, it is
undisputed that PHEAA has the power to sue, 24 Pa. Stat. §
5104.3, which it has done in this Court to collect amounts owed,
(Pl.'s Opp'n Ex. F. [Dkt. 77-6].), the power to purchase and
sell property, 24 Pa. Stat. § 5104(3), and the power to enter
into contracts, 24 Pa. Stat. § 5104(4).  (Def.'s Br. at 10-11,
Stmt. Fact ¶¶ 5-6; Pl.'s Opp'n at 3.)  All of this suggests
operational autonomy, see Oberg II, 745 F.3d at 139 (citations
omitted), even though the powers are statutory.  And while the
Pennsylvania Attorney General can represent PHEAA as an agency
of the Commonwealth, the Attorney General is also authorized to
hire outside counsel for litigation, as was done for this
litigation.  (Def.'s Br. at 18, Stmt. Fact ¶ 35 (citing Ex.6
[Dkt.58-7] ("Forney Decl.") ¶¶ 5-8).[5]  This also suggests
operational autonomy.  Md. Stadium Auth., 407 F.3d at 264-65
(citing Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 225
(4th Cir. 2001) (noting lack of control indicated by the fact
that local school board was represented by private counsel
instead of the Attorney General)) (additional citation omitted).

---

[5] Pele "[n]either [a]dmits nor den[ies]" this assertion of fact, without
citing to another portion of the record.  (Pl.'s Opp'n at 8.)  Because this
assertion of fact is not properly disputed with factual support from the
record, it is undisputed.  Fed. R. Civ. P. 56(e)(2).

Conversely, there also are indicia of State control
over PHEAA.  First, the Pennsylvania General Assembly confers
certain powers on PHEAA, as discussed above.  (Def.'s Br. at 10,
Stmt. Fact ¶ 5; Pl.'s Opp'n at 3.)  This weighs against autonomy
and in favor of immunity.  See College Sav. Bank v. Florida
Prepaid Postsecondary Education Expense Bd., 948 F. Supp. 400,
412 (D.N.J. 1996) (finding the second factor weighed in favor of
immunity in part because the agency had "only those powers
specifically granted to them by the legislature.").  Second, it
is undisputed[6] that PHEAA's Board of Directors consists of
sixteen state legislators, three gubernatorial appointees, and
the Secretary of Education, who is also appointed by the
Governor.  All gubernatorial appointees are confirmed by the
State Senate.  (Def.'s Br. at 11, Stmt. Fact ¶ 8 (citing Adolph
Decl. ¶ 12).)  This also "indicates state control."  Oberg II,
745 F.3d at 139 (citing Md. Stadium Auth., 407 F.3d at 264).[7]
Moreover, because PHEAA is an agency of the Commonwealth, the
General Assembly imposed significant limitations on PHEAA's
autonomy.  Specifically, it is undisputed that the Department of

---

[6] Pele disputes this fact, arguing that two of the current board members are
not "state-level officials."  (Pl.'s Opp'n at 4.)  But that is not responsive
to the material fact asserted.  While the two individuals cited by Pele are
not "elected" state-level officials, by statute they were appointed by the
Governor and confirmed by the State Senate.
[7] In 2010, however, the law was changed so that eventually four private
citizens will assume board positions vacated by state legislators.  (Def.'s
Br. at 12, Stmt. Fact ¶ 9; Pl.'s Opp'n at 4.)  No legislative Board member
has stepped down yet, however, and there are still sixteens legislators on
the Board.

the Auditor General may conduct audits of PHEAA activities,
(Def.'s Br. at 18, Stmt. Fact ¶ 38 (citing 24 Pa. Stat. §§
5104(1.1), 5108); Pl.'s Opp'n at 8.), the Governor must approve
PHEAA debts, or the issuance of notes and bonds, (Def.'s Br. at
14, Stmt. Fact ¶ 20 (citing 24 Pa. Stat. §§ 5104(3), 5105.1(a));
Pl.'s Opp'n at 5.), and PHEAA must report on its condition to
the legislature and the Governor at the end of each fiscal year.
(Def.'s Br. at 18, Stmt. Fact ¶ 37 (citing 24 Pa. Stat. § 5108);
Pl.'s Opp'n at 8.)  "These factors may mean, as PHEAA contends,
that it is simply a tool of the state."  Oberg II, 745 F.3d at
139.

In all, the Court finds that PHEAA does have some
intimate connections to the Commonwealth of Pennsylvania and the
state government.  Ultimately, however, this factor weighs
against holding that PHEAA is an arm of the state due to its
high degree of operational autonomy and independence.  See id.
("Although the facts relevant to this second factor cut both
ways, when we consider 'all reasonable inferences in favor of
plaintiff' as we must at this stage . . . [on a Rule 12(b)(6)
motion], we conclude that this factor also counsels against
holding that PHEAA is an arm of the state.") (citation omitted);
see also Brock, 933 F.2d at 1259 ("[On] summary judgment, we
must draw any inferences in the light most favorable to the non-
movant.") (citations omitted).  Therefore, the second factor

suggests PHEAA is not an arm of the state and counsels against
immunity.

### C. Local Versus Statewide Concerns

Third, the Court examines "whether the entity is
involved with state concerns as distinct from non-state
concerns, including local concerns." Oberg II, 745 F.3d at 137
(quoting Oberg I, 681 F.3d at 580).  "Non-state concerns,
however, do not mean only local concerns, but rather also
encompass other non-state interests like out-of-state
operations." Id. (internal quotation marks omitted) (emphasis
in original).  Here, the ultimate issue appears to be a conflict
between PHEAA's original statutory purpose and the expansion of
PHEAA's nationwide operation in recent years.  The parties agree
that PHEAA was originally created "for the benefit of the people
of the Commonwealth, for the improvement of their health and
welfare, and for the promotion of the economy," 24 Pa. Stat. §
5105.6, specifically to perform the government function of
improving the higher educational opportunities for Pennsylvania
residents, by assisting them with the expenses of higher
education, and by enabling lenders and post-secondary
institutions to do the same.  (Def.'s Br. at 9-10, Stmt. Fact ¶
1 (citing 24 Pa. Stat. §§ 5102, 5105.6); Pl.'s Opp'n at 1.)
Pele does not dispute the original purpose of PHEAA, but instead
argues that it has "expanded well beyond those purposes and

headed in a different direction as a national student loan

servicer."   (Pl.'s Opp'n at 1 (citing Guenther Dep. at 15-16

(stating that PHEAA stopped making direct loans to students in

March of 2008 because of the financial crisis)).)

        The Fourth Circuit found this factor weighed in favor

of arm-of-the-state status for PHEAA for two reasons.  First,

PHEAA was created to financially assist Pennsylvanians' access

to higher education, "an area of quintessential state concern,"

Oberg II, 745 F.3d at 140 (citing Md. Stadium Auth., 407 F.3d at

265).  Second, the level of PHEAA's out-of-state earnings in

2005 did not equate to a primary out-of-state-focus.  Id.   In

examining the three agencies at issue in Oberg II, the Fourth

Circuit emphasized that the focus of the third factor is whether

the agency is primarily involved with in-state concerns.  Oberg

II, 745 F.3d at 140 ("[I]t does not seem plausible that by 2006

. . . PHEAA's operations focused primarily out of state."); id.

at 142 ("But these assertions do not equate to an allegation

that [the defendant's] operations centered primarily outside

[the state] at any point in time."); id. at 145 ("The operative

question, however, is whether [the defendant] is primarily

involved with state concerns.") (emphasis in original and

additional citations omitted).  In the record now before the

Court, even if PHEAA is a national loan servicer, and even if

PHEAA "only gave back one-third of the profits to the students

of Pennsylvania and retained the rest for PHEAA reserves,"
(Pl.'s Opp'n at 3.), it is undisputed that PHEAA "lends,
purchases, services and guarantees loans for the sole purpose of
funding its operations and contributions to state grant
programs.  In other words, PHEAA generates earnings to return to
Pennsylvania students." (Def.'s Br. at 11, Stmt. Fact ¶ 7; Pl.'s
Opp'n at 3.)  Accordingly, this primary focus on in-state
concerns suggests PHEAA is an arm of the state.

     Pele "denied" this assertion of fact without support
in the record, as required by Rule 56(c).  (See Pl.'s Opp'n at 3
("Denied.  Mr. Guenther did say that it was a 'major focus of
PHEAA,' but the fact that it only gave back one-third of the
profits to the students of Pennsylvania and retained the rest
for PHEAA reserves, proves which one is more important to
PHEAA.").)  This unsupported argument does not establish a
genuine issue as to this material fact.  In short, while it is
undisputed that PHEAA services loans at the national level,
including guaranteeing loans in the states of Delaware,
Pennsylvania, Virginia, West Virginia, and Georgia, it is also
undisputed that PHEAA ultimately earns revenues from its
national activities and brings those revenues into the
Commonwealth of Pennsylvania and its Treasury for the primary
purpose of "funding its operations and contributions to state
grant programs."  (Def.'s Br. at 11, Stmt. Fact ¶ 7; Pl.'s Opp'n

at 3.)   The Fourth Circuit made clear in Oberg II that even if
PHEAA's reach is nationwide, the "operative question" under the
third factor is whether PHEAA is primarily involved with state
concerns.   Oberg II, 745 F.3d at 140.   The Court must answer
this question in the affirmative based on the evidence in the
record.

It is undisputed that PHEAA has been servicing loans
for students outside Pennsylvania since 1974, so this aspect of
PHEAA's operation is not new.   (Def.'s Br. at 11, Stmt. Fact ¶
6; Pl.'s Opp'n at 3.)   Indeed, PHEAA is authorized by state
statute to enter into contracts with "schools, lenders,
individuals, corporations . . . other states and the Federal
government to make, service, invest in, purchase, make
commitments to purchase, take assignments of or administer
loans." (Id. (citing 24 Pa. Stat. § 5104(1.1)(iii)).)   But most
notably, PHEAA generates revenues from all of its operations "to
return to Pennsylvania's students."   (Def.'s Br. at 11, Stmt.
Fact ¶ 6 (citing Guenther Decl. ¶ 13); Pl.'s Opp'n at 3 ("Admit
that PHEAA can enter into contracts and guarantee loans.
However, it has taken that authority to new heights in the past
few years when it began guaranteeing loans for other states . .
. that have nothing to do with its core mission to help
Pennsylvania students.").)

Pele attempts to dispute this material fact by arguing that PHEAA does not contribute enough of its revenues to Pennsylvania students.  (Pl.'s Opp'n at 24 ("PHEAA only contributes $75 million to the state grant program a year, which means that only a small fraction of that income ever went to the object of PHEAA's alleged mission: the students.").)  But the outcome of the Court's analysis under the third factor is not solely dependent on or limited to how the state agency budgets its revenues.  Rather, the Court must look to the broader picture of the agency's primary concern.  As this Court noted on the motion to dismiss, the Fourth Circuit "gave significant consideration to where a state agency's operations 'centered,' Oberg II, [745 F.3d at 142]; the [Fourth Circuit] did not suggest that the use of funds for in-state residents is entirely determinative."  (Mem. Op. at 19.)  It is undisputed that "[a]ll of PHEAA's lending, guaranteeing and servicing activities are performed by employees who work in Pennsylvania."  (Def.'s Br. at 19, Stmt. Fact ¶ 43; Pl.'s Opp'n at 9.)[8]  Any nationwide expansion of PHEAA's operation did not alter its primary purpose under the enabling statute to "benefit . . . the people of the Commonwealth, for the improvement of their health and welfare, and for the promotion of the economy."  24 Pa. Stat. § 5105.6.

---

[8] PHEAA employs one individual in the Washington, DC area, but that employee "does not perform lending, servicing and guaranteeing work"—PHEAA's primary concern.  (Def.'s Reply at 23.)

And PHEAA generates revenues that, at least in part, go directly to improving the higher educational opportunities for Pennsylvanian residents, "an area of quintessential state concern." Md. Stadium Auth., 407 F.3d at 265 (citations omitted). Stated differently, PHEAA's expansive out-of-state business ultimately benefits Pennsylvania and its citizens.[9] Therefore, the Court finds that the third factor suggests PHEAA is an arm of the state because PHEAA is primarily involved with in-state concerns.

D. State Law

Fourth, the Court considers "how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State." Oberg II, 745 F.3d at 138 (quoting Oberg I, 681 F.3d at 580). "Although the question of whether an entity is an alter ego of the state is a question of federal, not state, law, the manner in which state law addresses the entity remains important, and potentially controlling." Md. Stadium Auth., 407 F.3d at 264 (stating the court may consider "the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question.") (citations omitted). The treatment of PHEAA under

---

[9] Moreover, if PHEAA were dissolved today, all of its funds and property would revert to the Commonwealth of Pennsylvania. (Def.'s Br. at 15, Stmt. Fact ¶ 24 (citing 24 Pa. Stat. § 5109); Pl.'s Opp'n at 6 ("Admit.").)

relevant state law and the undisputed evidence in the record clearly supports a finding as a matter of law that PHEAA is an arm of the state.

The Fourth Circuit held in Oberg II that state law "supports PHEAA's contention that it is an arm of Pennsylvania." 745 F.3d at 140.  Specifically, the enabling statute states that PHEAA was created "for the benefit of the people . . . and the agency [performs] an essential governmental function."  24 Pa. Stat. § 5105.6.  "PHEAA's enabling legislation was made effective by 'amendment to the Constitution of Pennsylvania authorizing grants or loans for higher education,' [24 Pa. Stat.] § 5112, and Pennsylvania state courts have concluded that PHEAA is a state agency for jurisdictional purposes."  Oberg II, 745 F.3d at 140 (citing Richmond v. Penn. Higher Educ. Assistance Agency, 297 A.2d 544, 546 (Pa. Commw. Ct. 1972); Penn. Higher Educ. Assistance Agency v. Barksdale, 449 A.2d 688, 689-90 (Pa. Super. Ct. 1982)).  Pele's attempt to create a genuine issue of material fact under this fourth factor is unavailing.  The Pennsylvania Commonwealth Attorneys Act explicitly defines PHEAA as an "independent agency."  71 Pa. Stat. § 732-102.  But this only serves to distinguish PHEAA from executive agencies.  This does nothing to dispute the fact that PHEAA, an independent agency as defined by state law, is an arm of the Pennsylvania state government.

27

Similarly, Pele does not dispute other material facts that show PHEAA's relationship to Pennsylvania under state law is sufficiently close to make it an arm of the state.  The following facts in the record before the Court are undisputed. PHEAA's property, income, and activities are exempt from taxation, as is the income from the bonds and notes that PHEAA issues.  (Def.'s Br. at 14, Stmt. Fact ¶ 21 (citing 24 Pa. Stat. §§ 5105.6, 5107); Pl.'s Opp'n at 5 ("Admit.").)  PHEAA's officers and management employees are "public officials" subject to the Pennsylvania Public Official and Employee Ethics Act, which applies to "any agency performing a governmental function."  (Def.'s Br. at 19, Stmt. Fact ¶ 42 (citing 65 Pa. C.S.A. § 1102); Pl.'s Opp'n at 8 ("Neither [a]dmit nor deny.").) Furthermore, several incidents of working at PHEAA suggest state control: PHEAA's employees are paid from the Commonwealth Treasury; all employees must participate in the State Employee Retirement System; all employees must be covered by the Pennsylvania Employees Benefit Trust for healthcare; and PHEAA's employee badges state, "Commonwealth of Pennsylvania State Employee."  (Def.'s Br. at 18, Stmt. Facts ¶ 40; Pl's Opp'n at 8 ("PHEAA employees are paid from PHEAA's funds.  Mr. Craig in his Declaration simply says that the payments are run through the Treasury each month.").)  Accordingly, it is clear under Pennsylvania law and from the undisputed material facts in the

28

record that PHEAA is treated as a state agency.  Therefore, the fourth factor also weighs in favor of finding PHEAA is an arm of the state and entitled to immunity.

### IV. Conclusion

With the benefit of a more complete record after discovery, factors one, three, and four support a finding that PHEAA is an arm of Pennsylvania's state government entitled to Eleventh Amendment immunity.  Only the second factor suggests otherwise, and even then, this factor is not overwhelming. Weighing all four factors, the Court finds that PHEAA has met its burden as a matter of law to establish that it is "truly subject to sufficient state control to render [it] a part of the state."  Oberg II, 745 F.3d at 136 (quoting Oberg I, 681 F.3d at 579.).  In response, Pele did not sufficiently raise a genuine issue as to any material fact that demonstrates a need for trial.  Therefore, PHEAA is entitled to judgment as a matter of law and immunity under the Eleventh Amendment.

For the foregoing reasons, the Court will grant PHEAA's motion for summary judgment and deny Pele's cross-motion for partial summary judgment.  An appropriate Order shall issue.

|                      | /s/                              |
| -------------------- | -------------------------------- |
| October 7, 2014      | James C. Cacheris                |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |